UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RUN CHHOUN, | No. C 03-3219 SI (pr) |
| Plaintiff, | **ORDER GRANTING MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| J.S. WOODFORD; et al., | |
| Defendants. | |

## INTRODUCTION

Run Chhoun, an inmate on death row at San Quentin State Prison, filed this pro se action in state court, alleging that he had been deprived of various constitutional rights in connection with his placement on property control status for 90 days at San Quentin State Prison. The matter is now before the court on defendants' motion for summary judgment. The court will grant defendants' motion and enter judgment in their favor.

## BACKGROUND

A.   Procedural History

Run Chhoun filed an unverified complaint in which he alleged that he had been deprived of various constitutional rights in connection with his placement on a 90-day "property control" status at San Quentin. The complaint alleged that property control allowed a "prisoner to be stripped of all his personal property that is approved and allowed for him to purchase, receive, create, produce, own and possess in his cell." Complaint, p. 10. More significantly, the

1  complaint alleged that property control meant that Chhoun was "immediately placed in a
2  stripped solitary confinement cell for (90) ninety days," id., and was "totally confined to said cell
3  for the first ten days and let out of said cell during the following eighty days for only ten hours
4  per week or less for exercise in a solitary confinement exercise cage." Id. at 16.

5  Defendants removed this action to federal court based on federal question jurisdiction.
6  See 28 U.S.C. §§ 1331, 1441(b). The court reviewed the complaint and found that it stated
7  cognizable claims for relief for violations of Chhoun's rights under the U.S. Constitution's
8  Fourteenth Amendment Due Process Clause and Eighth Amendment.

9  Defendants next moved to dismiss under Federal Rule of Civil Procedure 12(b)(6).
10 Chhoun opposed the motion. The court denied the motion because it could not be said that
11 Chhoun could prove no set of facts which would entitle him to relief consistent with the
12 allegations of the complaint. The court cautioned, however, that its Rule 12(b)(6) analysis was
13 limited to the allegations in the complaint, and noted that a different result might occur when
14 facts outside the complaint's allegations were considered because the parties' papers had
15 indicated that the actual restrictions were far less severe than suggested by the allegations of the
16 complaint. Aug. 3, 2004 Order, p. 3.

17 Defendants have filed a motion for summary judgment. Chhoun has opposed it.

19 B.   The Facts
20 The following facts are undisputed unless otherwise noted:
21 Chhoun is an inmate on death row at San Quentin State Prison. He is assigned to the
22 Grade B program and to a single walk-alone exercise yard.[1] The single walk-alone yards (called

---

[1] "Grade B condemned inmates have a high escape risk or violence potential or are serious disciplinary or management cases." See Thompson v. Enomoto, 915 F.2d 1383, 1387 n.5 (9th Cir. 1990), cert. denied, 502 U.S. 1071 (1992). Grade B inmates are kept in the adjustment center and are more restricted than Grade A inmates on death row. Chhoun is on Grade B status pursuant to an initial program review which noted that he attempted to stab a deputy sheriff with two jail-made shanks while he was in county jail custody and had been involved in an escape plot. Brau Decl., Exh. A. Chhoun had been put on death row years earlier, thereafter was sent to a county jail during a trial on additional charges, received additional death sentences and returned to death row on March 2002.

2

1  "cages" by Chhoun) are 10 feet by 15 feet outdoor facilities constructed of chain-link fencing.

2  Inmates assigned to the Grade B program are entitled to state-issued clothing including denim pants, chambray shirts, boxer shorts, socks, t-shirts, jackets, watch caps, and soft-sole canvas shoes. They also are entitled to these state-issued items: toothbrush, comb, wash cloths, towels, tooth powder, toilet paper, bar soap, detergent, mattress, pillow, sheets, blankets, trash bag, CDC rule book, Title 15 of the California Code of Regulations, court decisions, plastic pen refill, indigent envelopes, and writing paper. In addition to the state-issued items, Grade B inmates are allowed to have personal non-state issued property, such as televisions, radios, newspapers and magazines; property control affects only items in this last category.

Adjustment Center inmates who engage in disruptive behavior may be placed on property-control status for an initial 90-day period. Property control restricts the inmate from possessing non-state issued property but does not restrict him from possessing state-issued items. A March 6, 2002, memorandum sent to inmates and staff described San Quentin's revised procedure for property control: "Essentially all Adjustment Center inmates who demonstrate the propensity of violence (i.e., Battery on staff, planning to batter staff or inmates, gassings, assaults upon other inmates, disruptive behavior) will be placed on 'Property Control' for an initial period of ninety (90) days. Inmates demonstrating the aforementioned behavior will be placed on property restriction immediately." Brau Decl., Exh. B. The memorandum stated that institutional classification committee ("ICC") review of the restriction would occur at the beginning and end of the 90-day period. The memorandum described the property that would be taken away during the 90-day period: all personal property including personal clothing, electrical appliances, and in-cell hobby material. Additionally, there would be no quarterly/annual packages, no canteen purchases and "[no] Leisure reading material (religious and legal not included)." Id. Finally, the memorandum stated that inmates would be entitled to one box equal to one cubic foot of legal materials during the 90-day period. After the 90-day period ended, the property would be returned to the inmate unless a decision was made by the ICC to keep him on property control.

Chhoun and several other inmates were put on 90-day property control on April 22, 2002

3

for engaging in disruptive behavior. The incident that precipitated the decision to put them on property control was a refusal by the 14 inmates on the exercise yards to exit the yards and return to their cells. Chhoun states that he was never personally asked to exit the yard and never refused to do so. The court need not decide whether Chhoun was involved in the incident in order to resolve his constitutional claims.

When he was put on property control, Chhoun received a notice of program review before the ICC. The property control restrictions were implemented on April 22 or April 23 and the ICC hearing was on April 25. The following items were removed from Chhoun's cell: 2 soft-covered books, 2 magazines, an address book, letters, legal materials, writing materials, and 3 postage stamps. Brau Decl., Exh E. Chhoun's legal materials were returned to him on April 29, 2002. Brau Decl., Exh. F.

On April 25, 2002, Chhoun appeared before the ICC and was given a limited opportunity to express his views. Chhoun states that as soon as he told the committee that at no time had he personally been asked or refused to leave the yard, the committee made him stop talking and would not listen to him any further. The ICC's memo regarding the initiation of property control for Chhoun did not mention any change in Chhoun's exercise program or Grade B program status.

Chhoun was allowed to exercise in the single-walk alone exercise yard on May 8, 15, and 22, June 18, and July 1, 7, 15 and 17, 2002. Chhoun contends this was less exercise time than the ten hours a week he normally had as a Grade B inmate and therefore must have been part of the property control. Defendants presented evidence – undisputed by Chhoun – that Chhoun and other inmates received less exercise time than usual during this period because construction work was occurring to expand the number of walk-alone exercise yards and that this temporary limitation on exercise lasted until July 24, 2002. Chhoun's own opposition states that problems with the exercise time prompted the inmate protest that was considered disruptive behavior and led to the imposition of property control on the inmates. See Opposition, pp. 16-17.

Including the 8 trips to the exercise yard, Chhoun was allowed out of his cell 37 times during the 90-day property control: on 22 days he exited to shower, on 5 days he exited to

4

attend the library in an adjacent building (and was authorized but refused 2 additional visits to the library), and on 2 days he met with visitors in a building adjacent to the building in which he was housed.

On July 18, 2002, Chhoun appeared before the ICC for program review. Because he had been disciplinary-free during the 90-day property control period, the ICC determined to allow him to have his personal property. Chhoun received his personal property that day. His assignment to the Grade B Program and single walk-alone exercise yard were continued.

In addition to the imposition of property control for a 90-day period, a CDC-115 rule violation report was issued to Chhoun charging him with "willfully delaying a peace officer" on April 22 for refusing a direct order to exit his single walk-alone exercise yard and return to his cell. He may not have received the CDC-115 until May 2, 2002. Plaintiff's Supplemental Exh. A. The CDC-115 hearing did not take place until August 14, 2002. Like the others deemed disruptive, Chhoun was immediately placed on property control although the hearing on his CDC-115 did not take place until more than a month after the 90-day period had ended. There is no evidence that an inmate must receive a CDC-115 if property control is imposed – the two appear to be separate decisions.

Chhoun was eventually found "not guilty" on the CDC-115 charge of willfully delaying a peace officer. See Plaintiff's Supplemental Exh. B. The CDC-115 decision was hardly a finding of innocence for Chhoun; instead, it was more of a determination that the evidentiary problems and delay in the hearing on the charge precluded a "guilty" finding. The original allegation was that a yard officer at 11:30 a.m. tried to recall the 14 inmates in the walk-alone yards and all 14 inmates refused the guard's order to exit the yards. Other corrections staff had to be called to deal with the situation and the inmates finally returned to their cells at 2:00, about 2½ hours after they were supposed to do so. Chhoun was given an opportunity to be heard at the CDC-115 hearing. In the explanation for the "not guilty" finding, the hearing officer wrote that the contents of the written report did not substantiate the charge in that the reporting officer did not indicate what he said to Chhoun individually and what Chhoun's individual response was, i.e., the reporting officer had lumped together the 14 inmates on the yards and discussed

5

the order to the group and the group's reply. The report's failure to show Chhoun's individual culpability plus the lengthy period of time between the incident and the hearing supported the dismissal of the charge, according to the hearing officer. Plaintiff's Suppl. Exh. B. The "not guilty" finding is not necessarily inconsistent with the placement on property control because the charge of which Chhoun was found not guilty was "refusing a direct order and willful delay of a peace officer" in violation of 15 Cal. Code Regs. § 3005(b); this was not the same as the "disruptive behavior" that was a listed ground for putting an inmate on property control.

## VENUE AND JURISDICTION

Venue is proper in the Northern District of California under 28 U.S.C. § 1391 because the events or omissions giving rise to the claims occurred at San Quentin State Prison in Marin County, which is located within the Northern District. This court has federal question jurisdiction over this action asserting claims under 42 U.S.C. § 1983. See 28 U.S.C. § 1331.

## LEGAL STANDARD FOR SUMMARY JUDGMENT

The court will grant summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial . . . since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) (a fact is material if it might affect the outcome of the suit under governing law, and a dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.")

Generally, the moving party bears the initial burden of identifying those portions of the record which demonstrate the absence of a genuine issue of material fact. The burden then shifts to the nonmoving party to "go beyond the pleadings, and by his own affidavits, or by the 'depositions, answers to interrogatories, or admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Celotex, 477 U.S. at 324 (citations omitted).

Where, as is the situation with defendants' qualified immunity defense, the moving party bears the burden of proof at trial, he must come forward with evidence which would entitle him to a directed verdict if the evidence went uncontroverted at trial. See Houghton v. Smith, 965 F.2d 1532, 1536 (9th Cir. 1992). He must establish the absence of a genuine issue of fact on each issue material to his affirmative defense. Id. at 1537; see also Anderson v. Liberty Lobby, Inc., 477 U.S. at 248. When the defendant-movant has come forward with this evidence, the burden shifts to the non-movant to set forth specific facts showing the existence of a genuine issue of fact on the defense.

A verified complaint may be used as an opposing affidavit under Rule 56, as long as it is based on personal knowledge and sets forth specific facts admissible in evidence. See Schroeder v. McDonald, 55 F.3d 454, 460 & nn.10-11 (9th Cir. 1995) (treating plaintiff's verified complaint as opposing affidavit where, even though verification not in conformity with 28 U.S.C. § 1746, plaintiff stated under penalty of perjury that contents were true and correct, and allegations were not based purely on his belief but on his personal knowledge). The complaint here is not verified and therefore is not evidence to be considered.

The court's function on a summary judgment motion is not to make credibility determinations or weigh conflicting evidence with respect to a disputed material fact. See T.W. Elec. Serv. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987). The evidence must be viewed in the light most favorable to the nonmoving party, and the inferences to be drawn from the facts must be viewed in a light most favorable to the nonmoving party. See id. at 631.

**DISCUSSION**

A.   Due Process Claim

Interests that are procedurally protected by the Due Process Clause may arise from two sources--the Due Process Clause itself and laws of the states. See Meachum v. Fano, 427 U.S. 215, 223-27 (1976). In the prison context, these interests are generally ones pertaining to liberty. Changes in conditions so severe as to affect the sentence imposed in an unexpected manner

7

1  implicate the Due Process Clause itself, whether or not they are authorized by state law. See
2  Sandin v. Conner, 515 U.S. 472, 484 (1995) (citing Vitek v. Jones, 445 U.S. 480, 493 (1980)
3  (transfer to mental hospital), and Washington v. Harper, 494 U.S. 210, 221-22 (1990)
4  (involuntary administration of psychotropic drugs)).  Chhoun's is not a case involving changes
5  so severe as to implicate the Due Process Clause itself.

6  Deprivations that are less severe or more closely related to the expected terms of
7  confinement may also amount to deprivations of a procedurally protected liberty interest,
8  provided that state statutes or regulations narrowly restrict[2] the power of prison officials to
9  impose the deprivation and that the liberty in question is one of "real substance." See Sandin,
10 515 U.S. at 477-87.  An interest of "real substance" will generally be limited to freedom from
11 restraint that imposes "atypical and significant hardship on the inmate in relation to the ordinary
12 incidents of prison life" or "will inevitably affect the duration of [a] sentence."[3] Sandin, 515
13 U.S. at 484, 487.

14 There is some uncertainty as to whether Sandin has eliminated the requirement that state
15 law narrowly restrict the power of prison officials to impose the deprivation and instead requires
16 only that there be an interest of real substance to determine that an inmate has a right to due
17 process before being deprived of that interest.  In Sandin, the Court criticized earlier decisions
18 that focused on the language of the regulations rather than the nature of the interest because they
19 "encouraged prisoners to comb regulations in search of mandatory language on which to base
20 entitlements to various state-conferred privileges."  Sandin, 515 U.S. at 481.  The language-
21 based approach in which courts and prisoners searched for negative implication from mandatory
22 language in prisoner regulations had "strayed from the real concerns undergirding the liberty
23 protected by the Due Process Clause."  Id. at 483.  The Court reiterated that states "may under

---

[2] A state most commonly restricts the power of prison officials by establishing "substantive predicates" to govern official decisionmaking, i.e., "particularized standards or criteria to guide the [s]tate's decisionmakers," and then requiring, "in explicitly mandatory language," that if the substantive predicates are met, a particular outcome must follow.  See Kentucky Dep't of Corrections v. Thompson, 490 U.S. 454, 461-64 (1989).

[3] Because there was no possibility that the duration of the death row inmate's sentence was affected, that kind of interest of real substance is not considered further in this order.

8

certain circumstances create liberty interests which are protected by the Due Process Clause. . . . But these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force. . . nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." Id. at 484. See Jackson v. Carey, 353 F.3d 750, 755 (9th Cir. 2003) ("focus of the liberty interest inquiry is whether the challenged condition imposes an atypical and significant hardship"); Duffy v. Riveland, 98 F.3d 447, 457 (9th Cir. 1996) (implying that Sandin reformulated working definition of liberty interest to include only "real substance" prong).

      While there may be some uncertainty as to whether the court needs to find mandatory language creating the liberty interest, there is no uncertainty at all that an atypical and significant hardship must exist to find that a liberty interest is protected by the Due Process Clause. Sandin made clear the need for an atypical and significant hardship and the Supreme Court recently reiterated its adherence to Sandin's rule in Wilkinson v. Austin, 125 S. Ct. 2384, 2394 (2005). "After Sandin, it is clear that the touchstone of the inquiry into the existence of a protected, state-created liberty interest in avoiding restrictive conditions of confinement is not the language of regulations regarding those conditions but the nature of those conditions themselves 'in relation to the ordinary incidents of prison life.'" Wilkinson, 125 S. Ct. at 2394 (citation omitted). Chhoun's repeated argument that he had a protected interest based on mandatory language in the California Code of Regulations is beside the point in light of Sandin. Whether the due process analysis after Sandin has two prongs – i.e., (1) an atypical and significant hardship and (2) a state-created interest due to mandatory language – or just one prong, it is beyond dispute that at least the first prong is required. That is, Sandin requires at least that there be an atypical and significant hardship, and Chhoun's discussion of mandatory language in the regulations does not speak to that issue.

      Chhoun's liberty interest would be an interest in not being subject to the 90-day property control. Only if the 90-day property control worked an atypical and significant hardship in relation to the ordinary incidents of prison life would procedural protections be constitutionally

9

1 required before it could be imposed.

2 San Quentin's property control policy did not work an atypical and significant hardship because it imposed quite limited restrictions on the inmate. The inmate was allowed to maintain all his state-issued property, a carton of legal materials, and religious reading materials during the 90-day period. The undisputed evidence before the court evokes an image completely at odds with the image of a nearly naked inmate sitting in his cell for 90 days that was suggested by Chhoun's original assertion that "the prisoner is immediately placed in a stripped solitary confinement cell," Complaint, p. 12. Chhoun may call it a stripped cell, but there were plenty of things allowed in that cell, including all his state-issued clothing (i.e., shirt, pants, boxer shorts, shoes, socks, jacket and cap), toiletries, bedding, a trash bag, a CDC rule book, court decisions and writing supplies. The policy also provided that the inmate could retain his religious reading materials and a box of his legal materials during the 90-day period. For some unexplained reason, Chhoun's legal materials were taken and not returned for a week, but a one-week deprivation of those materials did not work an atypical and significant hardship. Other than a week without legal materials, Chhoun only had to part company with a couple of books, a couple of magazines, an address book, letters, writing materials and a few stamps. He also was not allowed to obtain a television that he had purchased. The television was delivered with the rest of his materials at the end of the 90-day period. Spending 90 days without some of one's personal items simply did not rise to the level of an atypical and significant hardship.[4] And the fact that Chhoun was not allowed to purchase any canteen items or receive a quarterly/annual package during the 90-day period at least in theory (as there is no evidence that he had money to make any canteen purchases or would have received a package) did not work an atypical and significant hardship.

---

[4]California regulations restrict inmates' possession of property while in custody. For example, one regulation provides that inmates' property rights do "not include the right to possess such property within the institutions/facilities of the department." 15 Cal. Code Regs. § 3192. Another regulation provides for the storage of inmate property when the inmate is out for medical care, out to court or in administrative segregation. 15 Cal. Code Regs. § 3190(r). Chhoun has not shown that property restrictions are unique to California prisons or even to San Quentin's death row.

Chhoun asserts he was in "solitary confinement," but the evidence does not paint that picture either. There is no evidence that Chhoun went to a different cell or lost a cellmate during the 90-day period.[5] Chhoun was not confined to his cell. He was allowed out of his cell 37 times during the 90-day property control period for 22 showers, 5 visits to the library, 2 meetings with visitors, and 8 exercise sessions. In light of Chhoun's frequent opportunities to leave his cell and the allowance of all state-issued property for the entire period as well as his legal property during all but the first week of the 90-day period, one cannot say that he was subjected to an atypical and significant hardship in relation to the ordinary incidents of prison life.

The Supreme Court's recent case of Wilkinson is against Chhoun's position. In Wilkinson, 125 S. Ct. 2384, the Court held that the inmates had a protected liberty interest in avoiding placement in the state's supermax prison, although the state's informal nonadversary procedures for placement therein were adequate procedural protections to safeguard that liberty interest. The supermax prison prohibited almost all human contact (including conversation from cell to cell), kept the lights on all the time, and allowed an hour of exercise a day. Two of the key features of the supermax prison placement in Wilkinson are absent in Chhoun's case: the placement in the supermax prison was indefinite and inmates otherwise eligible for parole lost their eligibility while at the supermax prison. See Wilkinson, 125 S. Ct. at 2394-95. The Wilkinson Court suggested that placement in the supermax prison would not have implicated a protected liberty interest without the indefinite terms and the loss of parole eligibility because other than these two features plus the extreme limitations on all human contact, "these conditions likely would apply to most solitary confinement facilities." Id. at 2394. By contrast, the 90-day property control imposed on Chhoun had a set duration that was not particularly long and imposed controls on life's amenities that were not particularly severe. Additionally, unlike the facility at issue in Wilkinson, there was no loss of parole eligibility or other effect on the length

---

[5] Neither Chhoun nor defendants presented any evidence as to whether Chhoun went from being double-celled to being single-celled, although the parties' materials seem to suggest that Chhoun was single-celled before the 90-day period began as well as during the 90-day period. If he was housed in a single cell before, during and after the 90-day period, it can hardly be said that the 90-day property control caused him to be in solitary confinement if that term is understood to mean only that the inmate had no cellmate.

11

of Chhoun's sentence because only Adjustment Center death row inmates were subject to the 90-day property control policy.

Viewing the evidence in the light most favorable to Chhoun, the court concludes that, as a matter of law, the 90-day property control did not work an atypical and significant hardship in relation to the ordinary incidents of prison life. See, e.g. Rahman X v. Morgan, 300 F.3d 970, 973-74 (8th Cir. 2002) (no due process claim for deprivation of television, certain property, access to commissary and restrictions on outdoor exercise for twenty-six months); Cosco v. Uphoff, 195 F.3d 1221, 1224 (10th Cir. 1999), cert. denied, 531 U.S. 1081 (2001) (new prison regulation which limited the type and quantity of individual property in cells was not an atypical and significant deprivation); Arce v. Walker, 139 F.3d 329, 331-32 (2d Cir. 1998) (no due process violation in cell confinement for 18 days with only one opportunity for exercise); Frazier v. Coughlin, 81 F.3d 313, 317 (2d Cir. 1996) (loss of commissary, recreation, package, and telephone privileges for 12 days did not amount to an atypical and significant deprivation); Warren v. Irvin, 985 F. Supp. 350, 353 (W.D.N.Y. 1997) (denial of telephone, packages, commissary, earphones, movies, television, and third-shower for 161 days "does not represent the type of deprivation which could reasonably be viewed as imposing atypical and significant hardship on an inmate.")

Even if one considered placement on the 90-day property control to be the deprivation of a protected liberty interest, the procedural protections at San Quentin sufficed for constitutional due process purposes for an administrative decision. See Wilkinson, 125 S. Ct at 2395-96. Within three days after the commencement of the property control, a non-adversary meeting with Chhoun took place and he was allowed an opportunity (albeit limited) to express his views. See Chhoun Decl., ¶ 2 (at the April 25, 2002 classification hearing "I personally stated to the defendants that I was not involved in any refusal to exit the walk alone yard on April 22, 2002. And the defendants refused to even allow me to be heard any further.") The ICC meeting on April 25, 2002 provided sufficient procedural protection for the imposition of the 90-day property control.  First, the private interest affected was the possession of personal non-state issued property which "while more than minimal, must be evaluated, nonetheless, within

1 the context of the prison system and its attendant curtailment of liberties." Wilkinson, 125 S.
2 Ct. at 2395. Although the ICC hearing for Chhoun took place 2-3 days after his personal
3 property had been confiscated, that short delay does not affect the analysis because 2-3 days in
4 prison without one's personal non-state issued property is minimal and occurs routinely when
5 inmates are moved between facilities. See 15 Cal. Code Regs. § 3190(r). Second, the risk of
6 an erroneous placement under the procedures was not great as Chhoun received the core due
7 process protections of notice of the decision to put him on property control and an opportunity
8 to present his views (albeit for a limited time) to the ICC at the outset of the 90-day period. See
9 id. at 2395-96 (giving inmate notice of the reason for his intended placement and an opportunity
10 to be heard before being placed in supermax facility satisfied the core due process concerns).
11 Third, California's interest in preserving order in the prison is the dominant consideration and
12 the property control policy allowed a quick response to inmate disruption that may be a
13 precursor to a major security breach. See id. at 2396. The Adjustment Center inmates subject
14 to the policy were death row inmates already considered more of a security concern than other
15 death row inmates who likely presented a greater challenge for prison authorities to control
16 because they were already subjected to many restrictions and had no concern about the length
17 of their sentences. See footnote 1, supra.

18 Chhoun contends that he received far less exercise than normal during the 90-day
19 property control period. However, he does not present any evidence to dispute the defendant's
20 evidence that the limits on exercise yard time were not due to the property control but instead
21 were due to the fact that construction was ongoing on the exercise yards which caused many
22 inmates to have limited exercise time. Chhoun's argument actually supports the defendants'
23 position in that he states that he was "placed on 90 day property control due to an alleged protest
24 for not being allowed as much exercise time as other prisoners in the adjustment center, where
25 the mandatory nine hours of out of cell exercise yard time per week was not being provided and
26 even after some prisoners were requesting to talk with the unit captain about the problem before
27 leaving the exercise yards that day on April 22, 2002, the plaintiff never was personally asked
28 to leave the exercise yard." Opposition, p. 16; see also id. at 17 ("prisoners housed on the first

United States District Court
For the Northern District of California

13

floor of the adjustment center were only receiving yard days that amounted to less than half of what the other two floors were receiving.")  Regardless of whether Chhoun was part of the protest, the statement shows that inmates in his group already perceived that they were getting short-changed on exercise time <u>before</u> the property control was imposed on them.  The situation that preceded the property control was not caused by it.

Chhoun also contends that the property control was not properly imposed because his CDC-115 wasn't heard in a timely manner.  He mixes apples and oranges.  The CDC-115 charge of willfully delaying a peace officer was not the same as the disruptive behavior that prompted the imposition of the property control.  The property control policy memorandum stated that property control could be imposed for disruptive behavior.  The memorandum did not state that only activity that violated a particular regulation could trigger imposition of property control.  Disruptive behavior might occur without a willful delay of a peace officer.  For example, a riot could be considered disruptive behavior that would support imposition of property control even if the fact that the correctional officers did not ask each individual inmate to stop rioting (and note each individual's response) might preclude a finding of willfully delaying a peace officer.  There is no evidence that, if Chhoun had been found guilty on the CDC-115 charge, the discipline that could have been imposed was limited to 90-day property control.  The charge of which Chhoun was found not guilty was "refusing a direct order and willful delay of a peace officer" in violation of 15 Cal. Code Regs. § 3005(b), and that was not the same as the "disruptive behavior" listed as a ground for putting an inmate on property control.  Thus, the "not guilty" finding on the CDC-115 did not require a finding that Chhoun's placement on property control was improper. The issuance of a CDC-115 and the "not guilty" determination were irrelevant to the question of the propriety of the imposition of 90-day property control.

Chhoun has failed to raise a triable issue of fact that he had a constitutionally protected liberty interest.  Even if a constitutionally protected liberty interest existed, Chhoun has failed to raise a triable issue of fact that he did not receive adequate procedural protections in connection with its deprivation.  Defendants are entitled to summary judgment.

14

B.    No Property Interest Requiring Procedural Protections Existed

Construing Chhoun's case as one involving a deprivation of a property interest rather than a liberty interest seems to misconstrue the nature of Chhoun's claim. His personal property was not confiscated or destroyed, but only separated from him for 90 days. Chhoun's claim appears to be more that the 90-day property control, with all that it entails – temporary deprivation of non-state issued property, denial of privileges, and allegedly limited exercise time – violates his protected liberty interest.

Treating Chhoun's case as one asserting a right to due process before temporary deprivation of property would not enable him to avoid summary judgment. Property interests protected by the Due Process Clause exist, or fail to exist, according to state law. Board of Regents of State Colleges v. Roth, 408 U.S. 564, 577 (1972). That is, a property interest that has been initially recognized and protected by state law triggers due process protections. Paul v. Davis, 424 U.S. 693, 710; Roth, 408 U.S. at 577 (protected property interests "stem from an independent source, such as state law -- rules or understandings that secure certain benefits and support claims of entitlement to those benefits."). To assert such an interest, there must be a "legitimate claim of entitlement to it." Id. California state law does the opposite of creating a legitimate claim of entitlement to personal property in a prisoner's cell: Title 15, section 3192 of the California Code of Regulations provides that "[a]n inmate's right to inherit, own, sell or convey real or personal property does not include the right to possess such property within the institutions of the department." Chhoun had no state law right to possess any particular property in his cell and therefore had no right to due process before his personal property was temporarily removed from his cell. Cf. Barnett v. Centoni, 31 F.3d 813, 816 (9th Cir. 1994) (no due process violation when inmate's property was taken in connection with his reclassification to Grade B status in which he was not eligible to possess the additional property).

C.    Eighth Amendment Claim

The Eighth Amendment to the U.S. Constitution prohibits the infliction of cruel and unusual punishments. "The Constitution does not mandate comfortable prisons, . . . but neither

15

does it permit inhumane ones." See Farmer v. Brennan, 511 U.S. 825, 832 (1994) (internal citations and quotation marks omitted). The treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment. Id. Prison authorities may not deny prisoners "'the minimal civilized measure of life's necessities.'" Farmer, 511 U.S. at 834 (quoting Rhodes v. Chapman, 452 U.S. 337, 347 (1981)). In determining whether a deprivation of a basic necessity is sufficiently serious to satisfy the objective component of an Eighth Amendment claim, a court must consider the circumstances, nature, and duration of the deprivation. The more basic the need, the shorter the time it can be withheld. Johnson v. Lewis, 217 F.3d 726, 731 (9th Cir. 2000), cert. denied, 532 U.S. 1065 (2001). Although the Eighth Amendment protects against cruel and unusual punishment, this does not mean that federal courts can or should interfere whenever prisoners are inconvenienced or suffer de minimis injuries. See, e.g., Hudson v. McMillian, 503 U.S. 1, 9-10 (1992) (8th Amendment excludes from constitutional recognition de minimis uses of force); Hearns v. Terhune, 413 F.3d 1036 (9th Cir. 2005) (allegations of serious health hazards in disciplinary segregation yard for a period of nine months, including toilets that did not work, sinks that were rusted and stagnant pools of water infested with insects, and a lack of cold water even though the temperature in the prison yard exceeded 100 degrees, enough to state a claim of unconstitutional prison conditions); Anderson v. County of Kern, 45 F.3d 1310, 1314-15 (9th Cir.) (temporary placement in safety cell that was dirty and smelled bad did not constitute infliction of pain), amended, 75 F.3d 448 (9th Cir.), cert. denied, 516 U.S. 916 (1995); Hernandez v. Denton, 861 F.2d 1421, 1424 (9th Cir. 1988) (allegation that inmate slept without mattress for one night is insufficient to state 8th Amendment violation and no amendment can alter that deficiency), judgment vacated on other grounds, 493 U.S. 801 (1989); Holloway v. Gunnell, 685 F.2d 150 (5th Cir. 1985) (no claim stated where prisoner forced to spend two days in hot dirty cell with no water for hours).

The property control imposed on Chhoun came nowhere near to an Eighth Amendment violation. Chhoun retained all his state-issued property. He was separated from his legal materials for only a week. Focusing on the property that was actually taken shows how slight

16

the interference with Chhoun's normal custody was: he was not allowed access to 2 books, 3 magazines, an address book, some letters, some writing materials, 3 stamps and a television. One cannot seriously say that living without these amenities for 90 days deprived Chhoun of the minimal civilized measure of life's necessities. As a matter of law, living for 90 days without the foregoing did not amount to cruel and unusual punishment.

Chhoun would have the court add the lack of normal exercise periods to the mix to try to show an Eighth Amendment violation. However, this argument fails. Chhoun has failed to show a triable issue of fact that the limited exercise period was caused by defendants or the property control policy. The property control policy did not include any provision for a limit on an inmate's exercise time. Defendants have presented undisputed evidence that many inmates including Chhoun had less exercise than usual during the time period because construction was in progress to increase the number of exercise yards.

Even if Chhoun could solve the causation problem regarding the restrictions on his exercise time, he has not raised a triable issue of fact that there was an Eighth Amendment violation. Chhoun was allowed to exercise on seven days during the 90-day period, so his is not like those cases where inmates are deprived of all exercise during the time period. Cf. Lopez v. Smith, 203 F.3d 1122, 1132-33 (9th Cir. 2000) (en banc) (complete denial of outdoor exercise for 6-1/2 weeks meets the objective prong of Eighth Amendment deliberate indifference claim); Keenan v. Hall, 83 F.3d 1083, 1089-90 (9th Cir. 1996), amended, 135 F.3d 1318 (9th Cir. 1998) (undisputed denial of outdoor exercise for six months while in segregation sufficient to proceed to trial); LeMaire v. Maass, 12 F.3d 1444, 1458 (9th Cir. 1993) (upholding long-term denial of outdoor exercise to prisoner representing "grave security risk" who can exercise in his cell – subjective element of Eighth Amendment violation not shown). Additionally, Chhoun was out of his cell on 37 occasions during the 90-day period. He was allowed out of his cell to shower, to visit the law library, and to receive visitors, as well as to exercise. For this court to dictate the scheduling of construction work on facilities within the prison so as to make sure all inmates received complete parity in exercise time would be just the kind of interference with the "minutiae of prison operations in the name of the Eighth Amendment" that federal courts are

supposed to try to avoid.  See Wright v. Rushen, 642 F.2d 1129, 1132 (9th Cir. 1981).

Chhoun has not raised a triable issue of fact that the limits on exercise, whether viewed in isolation or in conjunction with the property control, amounted to an Eighth Amendment violation.  Defendants are entitled to judgment as a matter of law on the Eighth Amendment claim.

D.     Qualified Immunity Defense

The evidence in the record establishes that Chhoun's rights under the Fourteenth Amendment's Due Process Clause and the Eighth Amendment were not violated.  Defendants therefore are entitled to prevail as a matter of law on their defense of qualified immunity to the § 1983 claims.  See Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982) (defense of qualified immunity protects "government officials . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known); Saucier v. Katz, 533 U.S. 194, 201 (2001) (threshold question in qualified immunity analysis is:  "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?").

**CONCLUSION**

For the foregoing reasons, defendants' motion for summary judgment is GRANTED.  (Docket # 56.)  Defendants are entitled to judgment in their favor and against plaintiff on his claims under 42 U.S.C. § 1983.  The granting of summary judgment on the federal constitutional claims is without prejudice to plaintiff pursuing any state law claims in state court.  The clerk shall close the file.

IT IS SO ORDERED.

Dated: August ___, 2005

_____
SUSAN ILLSTON
United States District Judge